Good morning. May it please the Court, James Shaw on behalf of the appellant Video 1 Repair. Present with me today is Mr. Sherman Bahr, the owner of Video 1 Repair. If I may, I would request three minutes for rebuttal. The case before the Court today primarily focuses on the interpretation of a provision of the Song-Beverly Act that pertains to certain electronics and appliance products, and specifically a provision that obligates manufacturers to make available to service and repair facilities sufficient service literature and functional parts to effect repairs for seven years. The District Court found that, in this case, Canon was not obligated to supply service literature and functional parts to Video 1 because Video 1 was not an authorized or affiliated service and repair center. It is our initial contention that that finding and the insertion of authorized and or affiliated into that particular statute violates the plain language, plain meaning tenet of statutory construction. We do not believe that it is unambiguous. Video 1, as is alleged in the complaint, is a duly licensed service and repair facility by the California Bureau of Electronics and Appliance Repair. Now, having said that, if the Court is to conclude that there is ambiguity. Well, it's not just that. I mean, you're right, if you just looked at those four words in, what is it, 1793.03b, maybe you'd come to that conclusion. But this one statute is obviously part of a larger enactment. And so then when we go to the other provisions, which I have tried to spread out before me, because I know you're going to walk us through them. Sure, absolutely. It seems to me crystal clear that the statute wasn't trying to do what you're claiming it does, which is to take sides on who is supposed to be providing the service and repair to the customers. It's more just trying to ensure that somebody out there is going to be able to fix this thing if the consumer's product breaks and they need repair. So I guess I read the statute as a whole as being pretty much agnostic on who, the identity of the service repair facility that's going to be providing the service, but rather just saying somebody needs to be there and you, the manufacturer, need to make sure that they have the appropriate parts, whether it's an authorized company owned or an authorized independent or a truly independent service and repair facility. We don't care, just as long as there's somebody there. That's how I read this. So you tell me why, when we look at all this, that's not the right reading. Sure, absolutely. And I think by way of context, it's important to note that the pleading asserts that as a matter of practice and policy, Canon has decided that it's going to utilize, largely, its single repair factory that's in Irvine, California, and use this provision in the district court's interpretation of it to basically perform these repairs on its own without making, the allegation is there are no authorized service and repair facilities outside of the one Canon owned facility. So with that as a backdrop, and even independent of that, I think the starting place is the contextual analysis, when we look at what I will call the seven-year provision versus the express warranty provision, which is 1793.03, I'm sorry, 1793.2A3. Now that requires, similarly, manufacturers to make available to authorized service and repair facilities sufficient service literature and replacement parts to affect repairs during the express warranty period. So I submit that it makes sense that where, during the express warranty period, the repairs are going to be covered under warranty, free of charge, that a consumer would anticipate going to an authorized dealer where they would be covered, free of charge, or to the manufacturer, in this case, where Canon is the only game in town. It also makes sense, then, that in the contested provision, that the legislature would have made that broader because seven years is going to far exceed most warranties on consumer products, in this case it was a year, Canon offers a year, where you're going to have to go out of pocket. So matters of cost, convenience, accessibility, are going to squarely come into play. And so that's why the legislature made a broader reference in the contested statute. I think another thing that is important to note, Your Honors, is that from a statutory construction standpoint, Section 1793.3C is really telling. And that's part of the remedial provision if there's non-conforming goods. So what did the legislature say? Legislature said, if you're having trouble getting the manufacturer to act in accordance with its obligations, you have non-conforming goods, what consumer are some of your options? Well, one of the options is to go to an independent service and repair facility, have the work done, and then have the manufacturer cover the cost. So how could it be that one of the remedies under the statute is to go to a Video 1 if the district court is correct in its interpretation that Video 1 isn't entitled to the service literature or the parts to perform the repair? I guess I just don't agree with that. If you look at, I guess, at 1793.2, that's the provision that says, if you are a manufacturer and you offer goods, you must maintain either company-owned or authorized. Right? And that's the requirement that's imposed, at least for the express warranty. I guess I then look at 1793.3. I'm not quite sure why it's there, but it says, if for some reason you don't do what we told you to do in this other statute and you don't make available either company-owned or authorized, then authorized service and repair facilities, then these are the options that are available.  If for whatever reason the manufacturer doesn't do what it's required to do under a different provision, there has to be some remedy for the consumer, and this statute just lays out what that is. To use a ball-filled metaphor, I guess, it's a backstop without any of the metal behind the catcher. Right? I mean, it goes straight to the fan sitting behind it. I guess I'm just saying, if that's all this statute is doing, I don't see how it helps your position here. Well, I think that if there's a remedy that's provided that by the interpretation of the contested section wouldn't be available, then it renders the remedy pointless or useless, and I think that that's contrary to the statutory interpretation. Let me also point out, when it comes to Your Honor's concerns about the intent, in the legislative record there is reference, and this appears on page 62 of the record, to the fact that the California legislature was following the lead of the state of Indiana. Right. And it says, recently enacted a similar seven-year parts and service availability provision. So look at it. I think you're the one who cited this Indiana provision, if I'm remembering right, from the briefs, and I ended up looking at it. It's, what is it, 26-2-6-2-3? That's correct. Okay. And I thought this doomed your argument, frankly, if you're saying that the California statute is modeled on this one, because this one, I mean, the key word is or, right? I mean, just tell me why you think this provision supports your reading of the California statute when the Indiana legislature used the word or. Because this, the Indiana statute contemplates the provision of the parts and service literature to independent services. No, it doesn't. It does not require the manufacturer to do that. It says the manufacturer must make available to service representatives, which I think in context here means either the company owned or the authorized, or independent service facilities like your client. It's saying we're going to leave that option to the manufacturer. You must do one or the other, but you're not required to make them available to the truly independent folks. You just, and again, that's why I say the context for this whole statute is the legislature is being agnostic as to who the identity of the party that's going to provide the services, so long as the manufacturer ensures that somebody is there to fix the thing. And that's, to me, when I read your brief and I said, oh, yeah, let me look and see what Indiana did, and I thought, this doesn't help you. Well, and I think as to your point, this, again, the district court's reading would permit, as canon, as alleged, just to have the singular canon-only repair facility. Now, the sponsors of the bill, again, which I think speaks to the intent of the legislature at the time. Can you just, you're kind of dodging my question to you about the Indiana statute. Are you conceding that my reading of this is right, that it dooms your argument, and you just want to move on to something else, or do you have some explanation for the use of the word over there? I think that what it signals is that it contemplates that those could be provided to the independent repair facilities. At the manufacturer's election. Right. Right. And here, as you've conceded, the manufacturer's elected not to do that. They're going to have their own people do it. And that seems to me permitted under the Indiana statute. You're saying the California statute's modeled on it, so isn't that the end of your argument? Well, what we're saying is that by the use of service and repair facility, that that encompassed under the California statute the provision to the independent service and repair, that it's subsumed within the statutory language of California by it being broader. So you're saying that it's broader than the Indiana statute? Yes. Yes. But that the Indiana statute speaks to the notion that included within service and repair facilities would be the independent repair facilities. Do you want to discuss anything about your Cartwright, the antitrust claim? I'm sorry, Your Honor. I mean, the tying, killing, do you want to argue? Sure. So on the Cartwright claim, the court first found that the plaintiff had failed to sufficiently plead that there was consumer demand so that it would be efficient for a business to provide service separately from the parts. And I have a couple points on that. I think, first and foremost, we allege that VDO-1 was, in fact, doing that since 1994. This was brought as a class action. We allege that they're similarly situated like businesses that are in the same shoes. And I'd also note that I believe that the SBA provision at issue, contemplates separate markets for parts and service and even encourages it. So I think from a pleading standpoint, we have satisfied that burden. But I guess, so does the Kodak case, the Eastman Kodak case, require there to be separate consumer markets for parts and services in order for there to be a tying claim? That there be two distinct markets, yes. Consumer markets? Yes, is my understanding. So what the court did in distinguishing Kodak is he focused on the expense aspect. And specifically, he said, the district court said, in this case, the original product is small, increasingly cheap, and readily disposable when it turns out that one cell phone takes better video. And first and foremost, we have allegations that many of these cameras are several thousand dollars, including more than $5,000. So respectfully submit that there was no basis in the record for the finding that the pricing of a copier in the Kodak case is somehow materially different from the pricing of certain of these cameras. And we certainly would suggest that Cannon would not use that term as a marketing slogan for the camcorders, because that's not an accurate reflection of how the market views camcorders from either a pricing or a disposable aspect. I just wonder if there's a difference between consumer markets and commercial markets, because it seems like you might be focused on the commercial versus the consumer. Well, the allegation here is that these are primarily consumer-based camcorders, that even though certain of them are marketed as professional, the warranty excludes professional use. So we are focused in the consumer realm rather than the professional realm here. Okay. I'm going to reserve the balance of your time there. Thank you. Good morning, Your Honors. Richard Silberberg, representing the Appley Cannon USA, Incorporated. I would like to spend a few minutes with regard to Song-Beverly and then the balance of my time with regard to the Cartwright claim. And I don't want to repeat the statutory analysis that Judge Watford just went through, because that's exactly what I was planning to review in my argument. I would just like to put a little bit of an addendum onto that analysis by indicating that there are certain rules of statutory construction, which I know that the Court is very familiar with, but those rules of statutory construction have not been followed by the appellant. The key one is set forth in the Ninth Circuit case of Boise Cascade versus United States at 942 Fed 2nd, 1427. And what the Court held there is that the Court is required to, quote, interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous. And the companion to that is the United States Supreme Court's enunciation of the rule that identical words and phrases within the same statute should normally be given the same meaning. So I completely agree that you cannot pluck this one provision that is contested out of a statute which is admittedly very dense and very complicated and has been amended to boot, and say you just look at the plain meaning of the provision service and repair facilities. That is not permissible. What you need to do is look at two things, the other provisions that surround it and how that term is used in those other provisions, and you have to look at what the purpose and intent of the statute was. But is there no significance at all that the Section 179303 imposes, where we see this term imposes requirements outside of express rules and express warranties versus where it's referred to elsewhere? Not at all, Your Honor, and I recognize that a statutory analysis is difficult to communicate when you're dealing with multiple provisions in the context of an appellate argument. So I am going to try to do this in a very few minutes, but I think I can show you that the 1793.03b is completely consistent with the provision that counsel is placing most of its emphasis on, which is 1792, and show you why the legislature thought it was being crystal clear. And in that regard, I will say, Judge Watford... Well, if it wanted to be crystal clear, it could have defined the term, and it did not. It could have done better. And it seems like it would benefit consumers to allow any and all independent shops to acquire the parts and manuals needed to repair the equipment, which this is a consumer statute, so why don't we go with that meaning instead? Okay, I think there are a couple of questions there, so let me start with the latter one, and then I'm going to go back to the undefined concept. There is not one sentence in the legislative history, not one word in the legislative history, that indicates that the purpose of this statute was to foster a competitive environment for the service and repair of camcorders. As Judge Watford was saying a moment ago, that he believes the legislature was being agnostic, that's exactly right. The penultimate finding of the district court was that so long as consumers have a place to go to have their goods repaired, the manufacturer has met its legal obligation, and Song Beverly has achieved its objective. There is not a single allegation in the complaint with regard to the pricing of service and repair and repair parts. There is no basis in this record to conclude that consumers would be better off if people who are not authorized have unlimited access to parts. But let me give you the flip side of what would happen if someone like Mr. Barr were deemed to be eligible to purchase parts. What we would have is essentially a holding that every manufacturer of every air conditioner, television set, refrigerator, camera, water heater, and so on, would be eligible to purchase parts. What have you, within the state of California, would have to essentially become a de facto party to a requirements contract with every single person who decides to hold out a shingle that they are a repair person for consumer products. So my colleague sitting at council table, Mr. Schmidt, if he decided that he wanted to go into a second career, could notify Canon that I would like to start servicing your products. No, I am not trained. No, I didn't receive any kind of training from you or any other independent source, but I think I can do it, so I want you to sell me parts. And Canon would have no choice but to sell whatever parts at whatever time it was asked to do that. So what happens? The independent, without the training, starts repairing products, and the manufacturer no longer has an ability to budget, no longer has an ability to assure that the service is going to be competent. It loses the possibility of, I'm sorry, it incurs the probability of losing goodwill in the event that the product is not properly repaired, and I'll go one step further. What's to stop the independent from profiteering on the use of those parts when they become in short supply and starts to sell them on eBay, which happens, Your Honor. So what the court held below is that this would not, what is being sought here, would not promote a good thing for a manufacturer, which would disrupt the orderly provision of service. I'd like to, I want to make sure you devote enough time to the tying claim, and I have some questions regarding that. And I guess maybe I'll just ask you, why aren't the factual allegations that are placed forth in the complaint enough to make a plausible claim under Eastman, Kodak, and Nukal? Nukal, yes, I'm happy to do that, Your Honor. The problem with the complaint is there are no substantive facts whatsoever with regard to the definition of markets. Well, let's talk about it, because there's one allegation here. It says camcorder customers used to be able to and did purchase camcorder parts directly from Canon to install themselves without having to purchase services from Canon or other service and repair facilities. I mean, why doesn't that plausibly allege that there are separate markets for parts and services? Because the statute requires, and as the district court found, and this comes right out of the Kodak case, for service and repair to be considered two distinct markets, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts. Here, there is not a word in this complaint with regard to whether it would be efficient for Canon to maintain two separate markets for, on the one hand, service of camcorders, and on the other hand, spare parts. Not a word. The court even goes on to say... I'm sorry, you say efficient? Yes. And what the court goes on to say is, and this is a quote from Judge Feist's opinion, Mr. Barr has not addressed this issue at all. He entirely failed to allege that Canon could provide services and parts separately and economically, and has not even said how much replacement parts or repairs cost. He has therefore not pled the existence of two distinct markets, and of course, in order to have a tying claim, you have to plead two  And what the court goes on to say, Your Honor, is that there is not a word in this complaint that anybody other than Mr. Barr has been impacted by what's alleged. Basically, what we have here is a claim by Mr. Barr that he was unable to purchase three parts for three camcorders. That's it. There is not the identification of a single other independent service and repair facility throughout the state of California that has had any difficulty accessing parts in order to service camcorders. I guess I'll just focus on one of the allegations, because it seems like it's plausible that someone who buys a $5,000 camera would feel locked in to that purchase, and so doesn't that support? Here's one of the problems with being confined to the record. My recollection is that the allegation is that the camcorder market for Canon ranges somewhere from $200,000 to $2,000, but it's almost irrelevant, because what you heard counsel say a moment ago is that his claim is devoted to consumers. That he made, he emphasized the point that these are consumer markets. And the fact is that almost all of the consumer models are in the range of about $200. What the court was trying to say below is that unlike Kodak and Newcombe, where you're dealing with very expensive business equipment that runs into the tens of thousands of dollars, that you are unable to simply switch to another product if you don't like the cost of the service that you have now been locked into. Here, what the judge was saying, and perhaps in hyperbole, but perhaps not, is that if you don't like the cost of Canon's charges for repair and repair, you can't buy Canon, because it has the same capability. And if you don't like to do that, how about your digital camera that you can buy for $80? That has a camcorder video capability as well. So it is impossible to shoehorn a switching argument into the facts that have been pled in this case. It seemed from your brief that you were arguing that bars allegations were state-only legal conclusions. And so I was just looking at that. I was just trying to figure out how the allegation that the customers used to purchase parts separate from service is merely a legal conclusion. It seems like it could support. See, I don't even know what that means. That's the problem. They say customers, as couched in your question, Your Honor, used to be able to buy parts. Canon doesn't sell parts to end-user customers. So I think what he's saying is that he, Mr. Barr, used to be able to buy parts from Canon, and then ran into a problem in getting all of his parts requirements filled, during a period, as the record shows, of short supply. There were three parts for three camcorders in a multi-unit line that were not available to him. That's the limitation of what they plead factually. What would he have needed to have pled for plausible time? What's he missing? You're saying the efficient aspect of it? Is that the only part? He would have to show, well, there are a number of things he would have to show, but let's start with this. He would have to show that Canon would be able to efficiently sell separately spare parts and service in an economical way that would be accepted by consumers in such a way that they wouldn't bolt for other products that didn't have exorbitant service and repair and parts charges. They would have to show what the pricing is in these two markets. They would have to show what Mr. Barr currently charges to repair a camcorder, inclusive of the cost of the part that he has to buy from Canon or some other manufacturer. And he would have to compare that to the cost that Canon is charging for repair, and presumably compare those two in a way that shows, well, he shows that these really are distinct markets that can be tied together. And he has not even gotten to first base. You know, this antitrust claim procedurally, Your Honor, was added after the court had dismissed the Song Beverly claim. That's what this case is about. This was a hail Mary. This hail Mary doesn't get off the ground because there are simply no factual allegations. What they did is they found the Kodak case and they said, oh, this looks good for us. Let's plead the Kodak case. Thank you. Thank you very much, Your Honor. Thank you. I'll just address a couple of brief points. With respect to the kind of the parade of horribles about what would happen if Canon all of a sudden had to supply licensed, independent service and repair facilities with literature and parts, well, we don't have to speculate as to whether or not that's accurate. This has been going on for years and years. In fact, the complaint alleges that outfits like the appellants have, in fact, been receiving and purchasing service literature and functional parts from Canon for many years. And this was a recent policy change. So the notion, to Your Honor's point earlier, that somehow a conclusion, that an interpretation of the statute would ultimately permit what's alleged here to happen, and that is manufacturers in California to engage in anti-competitive conduct by being the only go-to place for repair services, both during the warranty period and for the seven years from the date of manufacture is respectfully antithetical to the whole concept of the Song-Beverly Act and the consumer protections that it is intended to provide. So we don't, again, we don't have to speculate as to whether there's a parade of horribles. The horrible, that parade ends with anti-competitive conduct and there being no conduit or outlet for consumers to go to other than a manufacturer. Well, I frankly didn't put much weight on counsel's argument on that point, because it seems to me from a policy standpoint, whether your position is better or not, that's not for us to decide. We're not sitting here as a legislature. And frankly, I admire you for bringing the case. I think I understand the principle that you're trying to vindicate here. And it might well, for all we know, be good for consumers as a whole. But I just come back to the statute that's before us, right? That's what we're trying to construe. And as I said at the outset, it seems to me the legislature had something different in mind from the creation of this independent competitive market between the company supply, owned or authorized facilities and folks like your client. That's for the legislature to decide. Maybe you should lobby the California legislature to amend the Song-Beverly Act again to make clear if that's what they want to do, to draft it in the way that you've argued for. I certainly respect your Honor's position. I just think that there, you know, where a legislature uses different terminology in similar provisions, the inferences, the assumption is that there's a reason for that, that there's a different meaning. And so I just think that there has to be, based on legislative history, based on the intent of the SBA, there has to be a reason why they used authorized when it comes to express warranty and didn't use authorized when it comes to the seven-year provision. And I think that the common sense explanation for that with respect to what it means for consumers provides a very reason basis for concluding that that's what the legislature's intent was. I very much appreciate the panel's time. Thank you.
judges: Murguia, Watford, Vanaskie